IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

RHONELLA CHAFFIN, an individual,

        Plaintiff,

v.                           CIVIL  ACTION  NO.  3:08-0870

NISOURCE, INC. d/b/a COLUMBIA GAS
TRANSMISSION COMPANY, an Indiana
Corporation,  et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment filed on behalf of Plaintiff Rhonella Chaffin, Defendant NiSource Inc. d/b/a Columbia Gas Transmission Company, and NiSource Long-Term Disability Plan (hereinafter collectively referred to as NiSource), and Defendant The Prudential Insurance Company of America (hereinafter Prudential).  For the following reasons, the Court rules: (1) Plaintiff's Motion for Summary Judgment on Count 1 is **DENIED**, but her alternative request to remand the benefit issue raised in Count 1 is **GRANTED** [Doc. No. 45]; (2) Plaintiff's Motion for Summary Judgment on Count 2 is **DENIED** as to Prudential, but **GRANTED** as to NiSource [Doc. No. 45]; (3) NiSource's Motion for Summary Judgment on Count 1 is **GRANTED**, but **DENIED** as to Count 2 [Doc. No. 42]; and (4) Prudential's Motion for Summary Judgment is **DENIED** as to Count 1, but **GRANTED** as to Count 2 [Doc. No. 40].  The Court **REMANDS** the issue of benefits to Prudential for further consideration.

Plaintiff filed this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461.  In her Complaint, she alleges two causes of action.  Plaintiff first alleges that she was wrongfully denied long-term disability benefits.  Second, she claims that Defendants failed to provide her a copy of the Plan and the complete Administrative Record. Defendants assert both claims are without merit.

## I.
## BENEFITS CLAIM

Initially, the Court recognizes that NiSource and Prudential assert different reasons why they are entitled to summary judgment with respect to Plaintiff's claim for benefits.  Prudential argues it is entitled to summary judgment upon the merits of Plaintiff's claim.  On the other hand, NiSource asserts that it is an improper party with respect to this claim because it is undisputed that Prudential is vested with discretionary authority to administer claims. *Citing Elie G. Ghattas Trust v. Unumprovident Life Ins.*, No. 1:03CV1614A (JCC), 2004 WL 2709715 (E.D. Va. Oct. 5, 2004) (stating "a claimant's employer is not a proper defendant if the employer exercised no control over the administration of the plan, even if the employer was listed as plan administrator in the summary of benefits"); *Williams v. UNUM Life Ins. Co. of Am.,* 250 F. Supp.2d 641, 645 (E.D. Va. 2003) (finding where the employer "had delegated to . . . [the insurer] responsibility for administering its short-term disability benefit plan[,]" the insurer is "a proper defendant").[1]  As it appears that Prudential, rather than NiSource, is the proper defendant with respect to Plaintiff's claim for benefits in Count 1, the Court **GRANTS** NiSource's Motion for Summary Judgment with respect to Count

---

[1]Both *Elie G. Ghattas Trust* and *Williams* cite *Gluth v. Wal-Mart Stores, Inc.*, 117 F.3d 1413, 1997 WL 368625, at *6 n.8 (4th Cir. 1997) (unpublished), which provides that an employer who has no control over the administration of a Plan is not a proper defendant.

1.  For the reasons that follow, the Court **DENIES** Prudential's Motion for Summary Judgment with respect to this Count, **DENIES** the like motion by Plaintiff, but **GRANTS** Plaintiff's alternative request that benefit issue be remanded for further consideration.

### A.
### Medical History

Plaintiff was employed by Columbia Gas Transmission Corporation, a division of NiSource, as a District Instrument Mechanic.  On October 22, 2001, Plaintiff was involved in an automobile accident during the course of her employment.  As a result of the accident, Plaintiff claims she sustained injuries to her shoulder, arm, and neck.  Although Plaintiff was able to return to work immediately, she also began a course of regular treatment for her injuries.

On January 6, 2005, Plaintiff sustained a second on-the-job injury when she slipped on a wet rocky hillside and fell, striking her lower back against a rock and hitting her knee.  The day after the accident, Plaintiff was seen by her family physician Marc A. Workman, M.D.'s assistant Jill Short who diagnosed her with low back pain, secondary to muscle strain and a contusion, and a knee sprain with contusion. *Admin. R.* at 260.  X-rays taken of her knee and lumbar spine appeared normal. *Id.* at 268-71.   Plaintiff was given an excuse to be off work for a week. *Id.* at 260.  A week later, Plaintiff returned to Ms. Short complaining of considerable back pain and a grinding feeling in her knee.   Examination revealed diffuse tenderness on palpation of the lumbar spine and tenderness over the lateral meniscus in her left knee. *Id*. at 261.  She was ordered to remain off work, undergo an MRI of her spine, and was referred to physical therapy. *Id*.  The MRI was negative.

At her next visit on January 27, 2005, Plaintiff continued to complain of back pain, but she said the pain in her knee was almost completely resolved. *Id*. at 262.  She also reported that her shoulder was bothering her more since the fall.  Dr. Workman directed Plaintiff to remain off work and continue with physical therapy.  He also assessed her with chronic shoulder pain that should be followed up with Dr. Bolano. *Id*.

On February 11, 2005, Plaintiff was seen by one of Dr. Workman's colleagues, Anna Patton, M.D., a family physician.  At that visit, Plaintiff said she was having back pain and sharp stabbing pain in her knee.  Dr. Patton recommended additional physical therapy and gave her an excuse to take an additional twelve weeks off from work. *Id*. at 263.  Following several sessions of physical therapy, Dr. Patton saw Plaintiff again on February 25, 2005.  Upon examination, Dr. Patton noted crepitation under Plaintiff's patella, tenderness along the medial aspect of her knee, and generalized tenderness to palpation at the S1 joint in her back.  Dr. Patton recommended she continue with physical therapy, but Dr. Patton did not feel she was ready for a work conditioning program. *Id*. at 264.

Plaintiff saw Dr. Patton again on March 15, 2005, and continued to complain of pain along the medial aspect of her knee. *Id*. at 266.  Dr. Patton did not find edema or calf tenderness, but did note tenderness along the medial aspect and generalized tenderness to palpation at the S1 joint in Plaintiff's back. *Id*.  Dr. Patton recommended progression to a work conditioning program. *Id*.

On March 31, 2005, Plaintiff saw Dr. Workman.  At that time, she told him that she had a lot of shoulder pain. *Id*. at 357.  She also said her back pain was limiting her activities and she was having difficulty walking or working at home.  Dr. Workman found no pretibial pitting edema and said Plaintiff's straight leg raise was negative.  However, he said she did have diffuse tenderness along her lower lumbosacral region and a limited range of motion in her shoulder, especially with abduction. *Id*.

On May 9, 2005, Plaintiff had another MRI of her knee. *Id*. at 317-18.  On May 11, 2005, Dr. Patton telephoned Plaintiff and explained that the MRI showed degenerative changes, but no evidence of a meniscal tear. *Id*. at 310.  However, it did show a collection of cysts.  Dr. Patton discussed with Plaintiff that she could return to work with restrictions that she not lift greater than twenty pounds for a period not to exceed ten minutes and that she not operate any heavy equipment.  Dr. Patton examined Plaintiff on May 13, 2005, and noted that she continued to have tenderness along the medical aspect of her knee and that Plaintiff told her she is unable to mow her lawn, operate a weed trimmer, or push her vacuum. *Id*. at 311.

On May 17, 2005, Plaintiff returned to work.  The next day, Plaintiff was getting out of a company vehicle when her left knee buckled and she twisted her back.  Plaintiff was seen by Dr. Patton on May 20, 2005.  Dr. Patton noted Plaintiff was having difficulty ambulating because of pain. *Id*. at 312.  Her examination of Plaintiff showed tenderness to palpation along the medial aspect of her patella, with fluid underneath the patella.  She also exhibited decreased range of motion because of pain.  Dr. Patton referred her to additional physical therapy and to wear a knee brace

when walking. *Id*.  Knee and lumbar spine x-rays taken on May 18, 2005, appeared normal. *Id*. at 315.

On May 31, 2005, Plaintiff returned to Dr. Patton complaining of swelling on her knee and worsening pain. *Id*. at 313.  Plaintiff also reported that her knee was giving out on her.  Dr. Patton noted edema around the knee and tenderness along the medical aspect of the knee.  Dr. Patton referred Plaintiff to Dr. Jack R. Steel for an evaluation. *Id*.

Dr. Patton saw Plaintiff again on June 13, 2005.  At that time, Plaintiff told her she continues to have problems with her knee locking up on her and she has had increased back pain. *Id*. at 314.  Dr. Patton examined Plaintiff and found no edema or calf tenderness, but continued tenderness along the medial aspect of the knee, fluid under the knee cap, and tenderness along the lower lumbar region of the back. *Id*.

On June 16, 2005, Luis A. Loimil, M.D., a board certified orthopaedic surgeon, performed an independent medical evaluation.  In his report, Dr. Loimil reviewed the medical records provided to him and conducted an examination.  Dr. Loimil opined that Plaintiff had reached maximum medical improvement with respect to her back, but not with respect to her knee. *Id*. at 297.  Given her consistent complaints of her knee locking, Dr. Loimil recommended another MRI or arthroscopic examination to determine the cause. *Id*.  He found her prognosis to be guarded given the fact she had multiple problems with little improvement. *Id*. at 296.  He also stated she had some

degree of symptom magnification. *Id.*  Dr. Loimil opined Plaintiff could not return to work at that time. *Id.* at 297.

On July 2, 2005, Plaintiff had a repeat MRI of her knee.  The report noted a cyst, but said "[t]here is no evidence of underlying meniscus tear." *Id.* at 198.

By letter dated July 13, 2005, Dr. Bolano said that Plaintiff had "a complex upper extremity problem.  The shoulder pain . . . is directly related to the automobile accident." *Id.* at 199. He also noted she had carpal tunnel syndrome, but it was not directly related to the accident. *Id.* at 200.

On July 21, 2005, Plaintiff was examined by Dr. Steel.  Dr. Steel found her left and right knee flexion to be equal at 140 degrees and extension to neutral. *Id.* at 204.  With respect to the left knee, he noted that "[m]edial and lateral McMurray's cause some discomfort anatermedially." *Id.*  He also found fullness and tenderness over the medial joint space, mild retropatellar crepitus, and no significant pain with patellar compression. *Id.*  Dr. Steel gave Plaintiff a lidocaine injection and believed she ultimately may require arthroscopic surgery.

On September 20, 2005, Dr. Steel's treatment note indicates Plaintiff's left knee was slightly tender at the anteromedial joint space, with some asymmetry about the anteromedial compartment when compared to the right knee. *Id.* at 208.  Based upon his examination, he did not recommend knee surgery. *Id.* at 209.

On October 12, 2005, Dr. Patton wrote Plaintiff's previous counsel. *Id*. at 232.  In that letter, Dr. Patton opined Plaintiff "suffers from a severe lumbar strain with lumbago and a strain of the (L) knee with medial capsular scarring that is post traumatic." *Id*. at 233.  She also mentioned that Plaintiff "has an old injury to the (L) shoulder which she developed at work" and her physical therapist believed she would not reach her full maximum benefit from therapy and work conditioning because of her constant left shoulder pain. *Id*.  Dr. Patton opined Plaintiff would continue to need medical treatment and she is "unable to perform the material and substantial duties of regular occupation due to the injuries that she sustained on 01/06/05." *Id*.

Plaintiff saw Dr. Patton again on November 15, 2005.  At the appointment, Plaintiff continued to complain of low back, knee, and shoulder pain. *Id*. at 562.  Dr. Patton noted continued tenderness along the medial aspect of Plaintiff's knee, tenderness and decreased range of motion in the left shoulder secondary to pain, and moderate lumbar tenderness to palpation. *Id*.

On November 22, 2005, Dr. Loimil did a second Independent Medical Examination to determine her percentage of whole person impairment. *Id.* at 431.  Upon examination and review of medical records, Dr. Loimil found she had a 13% whole person impairment of her spine, a 2% whole person impairment of her knee, and a 4% whole person impairment regarding the limitation of her range of motion in the left shoulder. *Id.* at 443-44.  In examining Plaintiff, Dr. Loimil noted she limps due to knee pain and walks at a slow gait. *Id.* at 438.

On December 16, 2005, Plaintiff was seen by Ms. Short for pain in her left shoulder. *Id*. at 566.  Ms. Short assessed Plaintiff as experiencing an exacerbation of her left shoulder pain with probable impingement syndrome and tendinitis. *Id*.  She was examined by Dr. Patton again on December 28, 2005, for continued complaints of her shoulder, knee, and lower back. *Id*. at 567.  Dr. Patton noted a decreased range of motion in her shoulder and tenderness along her knee with fluid under the patella. *Id*.  Plaintiff followed up with Dr. Patton on February 3, 2006. *Id*. at 571.  At that time, Plaintiff complained of her knee locking up on her.  Dr. Patton recommended her knee be scoped. *Id*.

Dr. Bolano examined Plaintiff on February 8, 2006.  At that time, Dr. Bolano did a lidocaine injection test, and he found she "has markedly positive impingement sign." *Id*. at 134-35.  Dr. Bolano opined that Plaintiff was a reasonable candidate for shoulder surgery.

Plaintiff saw Dr. Patton again on February 14, 2006. *Id*. at 572.  At that time, she had continued complaints of shoulder and low back pain and her knee locking up on her.  Plaintiff also stated she had numbness in her left hand.  Dr. Patton recommended Plaintiff follow up with Drs. Steel and Bolano. *Id*.

On February 16, 2006, Plaintiff had a Functional Capacity Evaluation performed at King's Daughters Medical Center by Christopher Crank, a physical therapist.  Upon his examination, Mr. Crank opined that Plaintiff "is capable of sustaining the medium level of work for an 8-hour day." *Id*. at 106.  He said that Plaintiff "participated fully in 8 out of 11 tasks and

demonstrated self-limiting participation by stopping on 3 out of 11 tasks." *Id.*  Plaintiff reported to him that her self-limiting participation was because of pain. *Id.*  On March 13, 2006, Mr. Crank filed an addendum to his report and stated that Plaintiff actually exhibited self-limiting behavior on 4 tasks. *Id.* at 178.

On February 20, 2006, Plaintiff saw Dr. Patton for complaints of muscle spasms in her back and shoulder and knee pain. *Id.* at 573.  Dr. Patton observed mild edema around the knee and decreased range of motion, with general tenderness to palpation.  She also noted tenderness along the entire lumbar region, and tenderness with palpable muscle spasms in the upper thoracic along Plaintiff's left shoulder. *Id.*

On February 21, 2006, Plaintiff was treated for her knee by Dr. Steel.  Plaintiff complained to Dr. Steel that her knee was locking up on her. *Id.* at 136.   Upon examination, Dr. Steel stated there were no obvious meniscal tears. *Id.* at 137.  He advised Plaintiff that she could either wait to see if it improved or undergo arthroscopic surgery. *Id.*

On June 7, 2006, Plaintiff and Columbia Gas Transmission Corporation took the deposition of Dr. Patton related to the Plaintiff's Workers' Compensation claim.  Dr. Patton testified that Plaintiff continues to be temporarily and totally disabled from her job, and she said "there is no physical way" Plaintiff could continue to do the type of work that she previously did. *Id.* at 160 & 167.  Dr. Patton opined Plaintiff  "is [d]isabled from her previous occupation." *Id.* at 160.

On June 20, 2006, Plaintiff was evaluated at Plaintiff's counsel's request by William Mitchell, M.D., a board certified orthopaedic surgeon.  Based upon his review of the medical records and his evaluation of Plaintiff, Dr. Mitchell stated:

> As a result of the January 6, 2005 incident, she sustained the following injuries: 1) Aggravation of the post-traumatic impingement syndrome left shoulder with significant loss of shoulder joint movement and limitation of shoulder function at or above the nipple line on the left.  2) Post-traumatic low back sprain and post-traumatic facet arthropathy L4-5 and L5-S1 left. 3) Continuation of left hand and finger paresthesias. 4) Post-traumatic aggravation of medial meniscus-synovial cyst pathology with recurrent giving way of the left knee, and post-traumatic chondromalacia.
>
> As a result of the final incident on May 18, 2005, she symptomatically aggravated her left shoulder and low back as well as accelerating the internal derangement of the knee which is producing the recurrent giving way status.

*Id.* at 133.  In his review of the medical records, Dr. Mitchell specifically mentioned that Dr. Hegg noted on November 26, 2002, that Plaintiff had some impingement signs and difficulty elevating her shoulder. *Id.* at 128.  Dr. Mitchell also mentioned that on April 23, 2003, Dr. Bolano diagnosed chronic shoulder impingement syndrome and Dr. Bolano believed she was a reasonable candidate for arthroscopic decompression surgery. *Id.* at 129.  Although aware of Dr. Bolano's diagnosis, Dr. Workman's note on June 5, 2003, recommended chiropractic care before attempting surgery. Plaintiff received some chiropractic treatments.  Dr. Mitchell stated that the medical records show some improvement by December of 2003, but "no breakthrough progress." *Id.*  He further noted that records show that in March of 2005, Plaintiff still was experiencing chronic left shoulder pain. *Id.* at 130.

Based upon his review of the records, x-ray findings, and his physical examination of Plaintiff, he opined Plaintiff suffered from "post-traumatic impingement syndrome left shoulder with mild restriction of motion and paresthesias left hand on the basis of a stretch injury to the axilla" as a result of the October 22, 2001 accident. *Id*. at 132-33.  He further stated, within a reasonable degree of medical certainty, that

> the present status of her shoulder alone would disable her from doing her regular work as she describes it, the present status of her left knee would render her unsafe for her usual work as she describes it, and the presence of her low back problem would restrict her from lifting, pushing, pulling, twisting, and bending with weight lifting limitations of 10 pounds.

*Id*. at 133.


On July 19, 2006, Plaintiff and Columbia Gas Transmission Corporation took the deposition of Dr. Bolano related to Plaintiff's Workers' Compensation claim.  Dr. Bolano stated that he had treated her for her shoulder injury since April 23, 2003. *Id*. at 144.  He said that he last examined her on February 8, 2006, and "[s]he still had the same diagnosis, chronic impingement syndrome and rotator cuff tendinitis." *Id*. at 145.  He said he believed she needed arthroscopic decompression surgery, but he was aware that Dr. Loimil disagreed with that recommendation.  *Id*. at 145-46.  Therefore, Dr. Bolano did a lidocaine injection which demonstrated Plaintiff had "a reasonable chance of benefitting from the arthroscopic surgery." *Id*. at 147.

In a progress note dated July 27, 2006, Dr. Steel diagnosed a meniscus medial tear. *Id*. at 452.  Dr. Steel stated "[t]his is a continuance of her antero-medial knee discomfort present since the time of her fall at work." *Id*. at 453.

On October 24, 2006, Andrea Wagner, M.D. conducted an independent peer review of the medical records made available to her.  Based upon those records, Dr. Wagner found Plaintiff had a mild functional impairment. *Id*. at 393.  She noted that Plaintiff had an impingement syndrome of her left shoulder that was diagnosed using a subacromial injection test. *Id*. at 393.  However, Dr. Wagner said there was no evidence of impairment until February 2006, which is when the injection test was performed by Dr. Bolano.  Therefore, Dr. Wagner found no evidence of impairment of Plaintiff's shoulder during the elimination period. *Id*.[2]  Likewise, Dr. Wagner found no evidence of any functional impairment of Plaintiff's lumbar spine and knee during the relevant time period. *Admin. R*. at 396.  Dr. Wagner concluded that there was "no evidence of functional deficit or the need for any physical restrictions and/or limitations particularly as it relates to sitting, standing, walking, reaching, lifting, carrying, and/or performing repetitive and fine motor hand activities." *Id*. at 394.

Thereafter, additional medical evidence was sent to Dr. Wagner for review. *Id*. at 397.  By an addendum dated November 10, 2006, Dr. Wagner found those additional records covered a

---

[2]The Certificate of Insurance contains a 180 day elimination period.  The elimination period is defined as "a  period of continuous disability which must be satisfied before . . . [a participant] is eligible to receive benefits from Prudential." *NiSource Inc., Class 1, Long Term Disability Coverage*, at 12.  In this case, the elimination period was from January 7, 2005 through July 15, 2005.

variety of primary care conditions and did not contain any substantially new medical information related to a functional impairment during the relevant time period. *Id*. at 402.  She noted that in July of 2006 Dr. Steel diagnosed a possible medical meniscal tear, which would mean that Plaintiff should "avoid squatting, kneeling, crouching, and repetitive flexion-extension of the left knee." *Id*. at 403.  However, Dr. Wagner noted that Dr. Steel's diagnosis and recommendations occurred well after the end of the elimination period. *Id*.  Thus, Dr. Wagner did not alter her prior assessment. *Id*.

## B.
## Procedural History

Plaintiff has not returned to work since she twisted here knee and back on May 17, 2005.  She applied for long-term disability benefits on May 23, 2005. *Id*. at 33.  On July 1, 2005, Prudential issued its first letter denying Plaintiff's claim for long-term disability benefits. *Id*. at 84. In the letter, Prudential included the Plan's definition of "disability," which is defined as:

> You are disabled when Prudential determines that:
>
> ● you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> ● you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

*Id*.  Prudential stated in the letter that it found "there is no medical evidence of an impairment that would prevent . . . [her] from performing . . . [her] regular occupation.  Records reveal normal diagnostic testing and physical exams as well as minimal use of medication for pain." *Id*. at 85.

-14-

Thus, Prudential determined Plaintiff did not meet the definition of disability throughout the entire elimination period. *Id.* Through counsel, Plaintiff appealed Prudential's decision. On November 8, 2005, Prudential requested additional information from counsel, which included medical records from Drs. Patton, Steel, and Bolano, which were not provided to Prudential before the initial denial letter. *Id.* at 79.

On January 31, 2006, Prudential sent counsel a letter stating that it could not yet determine Plaintiff's claim and it was setting up a Functional Capacities Evaluation. *Id.* at 71. That evaluation was performed on February 16, 2006, by Mr. Crank, a physical therapist at King's Daughters Medical Center. By letter dated March 7, 2006, Prudential reaffirmed its position that Plaintiff was not eligible for long-term disability benefits. *Id.* at 67. Prudential stated that, while Plaintiff "may experience some pain and discomfort, the medical records do not support that . . . [her] impairment rises to such a level that it is severe enough to render her significantly impaired." *Id.* Plaintiff again appealed this decision.

By letter dated September 12, 2006, Prudential informed counsel that it needed additional information to complete its review. *Id.* at 62. Specifically, Prudential notes that it does not have all the medical records referred to by Dr. Mitchell in his report of June 20, 2006. The letter requests counsel provide all Plaintiff's "medical records including treatment notes, evaluations, referrals, physical therapy notes, operative notes, diagnostic testing records, etc. In addition, please include any medical records that exist from June 20, 2006, the date of Mr. Mitchell's examination, to present." *Id.* Prudential warns that if it does not receive the requested information, it "will

complete the appeal review based on available file information at that time." *Id.* By letter dated

November 15, 2006, Prudential informed counsel that it was reviewing her claim. *Id.* at 57.

On November 20, 2006, Prudential issued its final decision, affirming its prior

decision to deny Plaintiff's request for long term disability benefits based upon its review of the

medical records in the administrative record. *Id.* at 50-55.  With respect to Plaintiff's shoulder,

Prudential stated, in part:

> The record includes an orthopedic assessment of an
> impingement syndrome of the left shoulder.  The
> diagnosis was mad[e] utilizing a subacromial
> injection test.  Dating back to January 22, 2005, Ms.
> Chaffin did have complaints of left shoulder pain;
> however, range of motion at that time was noted to be
> good.  However, there is no evidence of impairment
> as it relates to the shoulder until February 2006, at
> which time physical examination was remarkable for
> an impingement sign.  It was at that time that a
> Lidocaine injection test was performed in which Dr.
> Bolano indicated that Ms. Chaffin had chronic
> impingement and would benefit from left shoulder
> arthroscopic subacromial decompression.  As such,
> there is no evidence of impairment stemming from the
> shoulder through the elimination period of January 7,
> 2005 through July 15, 2005 and beyond until
> February of 2006.

*Id.* at 54.

Prudential also discussed Plaintiff's back and knee problems, but found no evidence

of functional impairment during the elimination period.  Prudential noted that x-rays and MRIs were

unremarkable during that time.  Although one MRI showed a likely synovial or ganglion cyst on her

left knee,  there was no evidence of a meniscal tear at the time.  In addition, lumbar x-rays revealed

-16-

minimal spurring and mild narrowing at L5-S1, but it did not support a functional deficit. *Id*.

Prudential recognized that by February 2006 was diagnosed with impingement syndrome and it

would require restrictions on overhead motion to an occasional basis.  It also noted that in July of

2006, Dr. Steel assessed her as having a possible meniscus tear, and he recommended she "avoid

repetitive flexion-extension of the left knee including repetitive stair climbing, bending, kneeling,

squatting, crouching or crawling in excess of an occasional basis." *Id*. at 55.  However, Prudential

found these to be disabilities that occurred subsequent to the elimination period and, thus, could not

be considered under the Policy.  Prudential advised Plaintiff that its decision was final and, if she

disagreed with the decision, she could file a lawsuit under ERISA.


On August 28, 2007, Plaintiff's new counsel wrote letters to NiSource and Prudential

requesting copies of the Plan description and policy and Plaintiff's file. *Plaintiff's Motion for

Summary Judgment, Exhibit E*; *Admin. R.* at 381.  In the letter to Prudential, Plaintiff also asked that

the Administrative Record be reopened. *Admin. R.* at 381.  By letter dated September 11, 2007,

Prudential responded by stating it was denying reconsideration because Plaintiff already had

exhausted her administrative remedies. *Admin. R.* at 49.  Prudential reiterated that the November 20,

2006 letter was its final determination. *Id*.[3]  Thus, Plaintiff filed this action on June 25, 2008.

---

[3]As will be discussed later, the letter further provided that she should obtain the file from
previous counsel. *Id*.

Prior to filing this action, Plaintiff applied for and was granted social security disability benefits.  On November 20, 2007, the Administrative Law Judge issued his decision and found Plaintiff disabled as of January 6, 2005, the date of her slip and fall at work.

### C.
### Standard of Review

Under ERISA, courts must review an administrator's decision to deny pension plan benefits *de novo*, unless the plan itself confers discretionary authority upon the administrator "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989).  When an administrator  possesses such discretion, courts may review the eligibility determination only for an abuse of discretion. *Id*; *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315 (4th Cir. 2001) (citation omitted).  In this case, there is no dispute that Prudential is the Claims Administrator of the Plan and it has sole authority and discretion to determine eligibility for benefits. *See NiSource Inc., Class 1, Long Term Disability Coverage*, at 35 (providing "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits").  However, where an entity both evaluates claims for benefits and pays benefit claims, as is the case here, a conflict of interest exists. *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008).  "If a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion." 128 S. Ct. at 2348 (emphasis added in *Metropolitan Life;* quoting, in part, *Firestone Tire & Rubber Co.*, 489 U.S. at 115; internal quotation marks and other citation omitted)).

Prudential argues the Court only should consider a "potential" conflict of interest as a factor in this case and argues that Plaintiff has failed to show any evidence of an "actual" conflict of interest or a history of biased claims administration.  Although the Court agrees that Plaintiff has not demonstrated any history of biased claims administration, the Court finds a conflict of interest still exists.  In *Glenn*, the Supreme Court made it clear that, even when it is an insurer rather than an employer that both evaluates claims and pays benefits, a conflict of interest is created. 128 S. Ct. at 2349-50.  However, as a conflict of interest is just one factor for a court to consider, it must be weighed in combination with other factors.[4] *See Carden v. AETNA Life Ins. Co.*, 559 F.3d 256, 260-61 (4th Cir. 2009) (recognizing that, under *Glenn*, courts "must consider the administrator's conflict of interest as only 'one factor among many' in determining the reasonableness of the administrator's decision exercising discretionary authority'" (quoting *Glenn*, 128 S. Ct. at 2351)).  The Supreme Court explained in *Glenn*:

---

[4]Other non-exclusive factors that guide ERISA abuse-of-discretion review, which previously were identified by the Fourth Circuit in *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43 (footnote omitted).

-19-

any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.  The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.   It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

128 S. Ct. at 2351 (citations omitted).  In this case, there is little in the record showing Prudential has procedures in place that serve to reduce potential bias and promote accuracy.  On the other hand, as previously mentioned, Plaintiff has offered no evidence that Prudential has a history of making biased decisions on claims.  Although the Court finds that the nature of Prudential's responsibility to both evaluate claims and pay benefits creates a conflict of interest which may be entitled to some weight in this case, for the reasons that follow, the Court need not, and does not, rely upon this factor in finding that Prudential abused its discretion.

## D.
## Discussion

Plaintiff argues that Prudential's decision with respect to her left shoulder impingement syndrome is totally unsupported by the medical records.  Although Prudential admits she was diagnosed with impingement syndrome, it found no medical evidence that the condition existed before February 2006 and, thus, it occurred outside the elimination period.  However, as

Plaintiff points out, the medical records do show that Plaintiff was diagnosed with impingement syndrome as early as 2003.

Dr. Bolano testified at his deposition that he had treated Plaintiff for her shoulder injury since April 23, 2003. *Id.* at 144.  He stated that when he saw her in 2006, "[s]he still had the same diagnosis, chronic impingement syndrome and rotator cuff tendinitis." *Id.* at 145.  Prudential argues that Dr. Bolano did not say that he found Plaintiff to be impaired as of April 23, 2003, and he did not perform the lidocaine injection test until February 2006.  Although it is true that Dr. Bolano performed a lidocaine injection test in 2006, it was entirely inaccurate for Prudential to conclude that there was no evidence the condition existed before 2006.  Dr. Bolano clearly indicted in his testimony that "[s]he still had the same diagnosis" of chronic impingement syndrome and rotator cuff tendinitis as she did prior to 2006.

Moreover, in his review of the medical evidence, Dr. Mitchell noted that Dr. Bolano diagnosed Plaintiff with chronic shoulder impingement syndrome on April 23, 2003. *Id.* at 129.  In fact, Dr. Mitchell stated that "[o]n April 23, 2003, Dr. Bolano diagnose[d] a chronic shoulder impingement based on a lidocaine injection test which relieved her pain 100%.  He thought she was a reasonable candidate for arthroscopic decompression surgery to the left shoulder." *Id.*  Similarly, Dr. Mitchell noted that Dr. Hegg found Plaintiff had impingement signs and difficulty in elevation in 2002. *Id.* at 128.  Dr. Mitchell himself opined that, "[a]s a result of the January 6, 2005 incident," Plaintiff sustained "[a]ggravation of the post-traumatic impingement syndrome left shoulder with significant loss of shoulder joint movement and limitation of shoulder function at or above the nipple

line on the left[.]" *Id.* at 133.  In addition, the medical records show Plaintiff complained about shoulder pain during the elimination period.  Plaintiff reported increased pain at her doctor's visits in January and March of 2005, and Dr. Bolano said in his letter dated July 13, 2005, that her shoulder pain is directly related to the 2001 car accident. *Id.* at 199, 262, & 357.  Given this evidence, the Court finds that Plaintiff suffered from shoulder impingement syndrome before and during the elimination period and Prudential clearly abused its discretion in ruling that there was "no evidence of impairment as it relates to the shoulder until February 2006[.]" *Id.* at 54.

In *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999), the Fourth Circuit stated that, although remand should be granted sparingly, it "is most appropriate 'where the plan itself commits the trustees to consider relevant information which they failed to consider or where [the] decision involves records that were readily available and records that trustees had agreed they would verify.'" 190 F.3d at 609 (citations omitted).  Here, the Court finds that Prudential did not consider any evidence that Plaintiff suffered from shoulder impingement syndrome prior to 2006.  As such evidence was available to Prudential as part of the administrative record, the Court find that remand for consideration of this evidence is necessary.  Therefore, the Court **GRANTS** Plaintiff's request for remand.

In doing so, the Court notes Plaintiff questions why medical records prior to July of 2005 from Drs. Bolano and Hegg and her neurologist Dr. McComas were not part of the administrative record.  Plaintiff states these records were readily available to Prudential and Plaintiff provided Prudential a release to obtain them.  Therefore, Plaintiff asks that she be able to submit the

records for Prudential's consideration on remand.  On the other hand, Prudential states that it made requests for medical records, and it had Dr. Wagner review all the additional medical records provided by Plaintiff's prior counsel.  Although the Court finds that Plaintiff's previous counsel should have ensured that the records at issue were submitted to Prudential, it is not entirely clear to the Court why they were not included.  Prudential did have a signed release to obtain Plaintiff's medical records, and the Court finds it impossible to review the documents contained within the administrative record without recognizing that the medical records at issue are missing and likely contain relevant information in determining Plaintiff's claim for benefits.  Given this posture and the fact the case is being remanded for further consideration, the Court finds the missing records should be included in the administrative record in order to give Plaintiff a full and fair review of her claim.  To be clear, the Court is only permitting the missing records from Drs. Bolano, Hegg, and McComas to be submitted.  The Court will not permit the parties to submit any other medical records.

Plaintiff also asserts that evidence related to her knee locking, with pain and swelling, and the appearance of cysts are all symptoms of a meniscus tear which was not properly considered by Prudential.  As Plaintiff recognizes, however, a diagnosis of a meniscus tear was not made until July 27, 2006, by Dr. Steel.  In fact, MRIs taken on May 9 and July 2, 2005, showed no evidence of a meniscal tear, and Dr. Steel stated on February 21, 2006, that there was no evidence of a meniscal tear.  *Id*. at 137, 198, 310, and 317-18.  Thus, the Court finds that Prudential did not abuse its discretion in determining there was no evidence of a meniscal tear until July of 2006.  Nevertheless, merely because Plaintiff cannot demonstrate she has a meniscal tear during the

-23-

elimination period does not mean that Prudential can entirely discount the fact that Plaintiff obviously had problems with her knee during the elimination period.

Other than January 27, 2005, Plaintiff had fairly consistent reports of problems with her knee.  She reported it felt like it was grinding and it would lock up and buckle on her, which she said caused her to fall on May 17, 2005.  Physical examinations consistently revealed tenderness along the lateral meniscus and it was noted she had crepitation and fluid under the knee cap.  It also is known that she had cysts.  On remand, Prudential must consider this evidence in combination with Plaintiff's other conditions, including, but not limited to, her chronic shoulder impingement and her complaints of back pain, in deciding whether she meets the Plan's definition of disability.

Plaintiff further argues that the Court should find that Prudential abused its discretion in finding she was not disabled during the elimination period as she was awarded social security disability benefits with a disability start date of January 6, 2005.  In support, Plaintiff points to the fact that both the social security regulations and Prudential define disability in terms of "any gainful" activity.[5] *Citing Hines v. Unum Life Insurance Co. of America*, 110 F. Supp.2d 458, 468

-----

[5]20 C.F.R. § 404.1505(a) provides, in part:

> The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  To meet this definition, you must have a severe impairment(s) that makes you unable to do your past

(continued...)

(W.D. Va. 2000) (holding the plan administrator should have given the social security disability award significant weight where the definitions of disability in the social security regulations and the plan are sufficiently analogous).  However, the social security decision in this case was not decided until  exactly a year after Prudential issued its final decision on November 20, 2006.  As this decision was not available to Prudential when it made its final decision, it could not have been a part of the administrative record and it should not be made part of the administrative record on remand.  *See Hines,* 110 F. Supp.2d at 464  "[w]hen reviewing an administrator's decision, courts may not consider extrinsic evidence, that is, any evidence not brought before the administrator, initially or in subsequent administrative reviews" (citing *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999)); *see also Seiser v. Unum Provident Corp.*, 135 Fed. Appx. 794, 799 (6th Cir. 2005) (holding under abuse of discretion standard "that where a plan administrator has denied a disability claim, a remand to the administrator to consider a contrary SSA determination issued after the administrative decision is unwarranted").

Lastly, Plaintiff also argues that Prudential applied the wrong elimination period.  In its November 20, 2006, decision, Prudential wrote that in order for Plaintiff to be eligible to long

---

[5](...continued)

> relevant work (see § 404.1560(b)) or any other substantial gainful work that exists in the national economy.

20 C.F.R. § 404.1505(a), in part.  In relevant part, the Certificate of Insurance states: "After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience." *NiSource, Inc., Class I, Long Term Disability Coverage*, at 11 (italics and bold original).

term disability benefits, she must be continuously disabled throughout the elimination period.  *Id*.
at 50.  Prudential incorrectly stated in the letter, however, that the elimination period was 90 days
when in actuality the elimination period was 180 days. *Id*. at 51.  In other parts of the letter,
Prudential correctly identified the elimination period from January 7, 2005 through July 15, 2005.
*Id*. at 54.  Although Prudential incorrectly wrote it was a 90 day elimination period, it is obvious
from the conclusion of the report that it reviewed the evidence to determine whether Plaintiff was
disabled during the actual 180 day elimination period.  Thus, the Court rejects Plaintiff's argument
that Prudential abused its discretion in this regard.[6]  Likewise, the Court rejects Plaintiff's allegation
that she was never given the opportunity to establish that she was continuously disabled during the
elimination period.  Prudential's first denial letter stated she was being denied benefits because she
did "not meet the requirements of the group policy throughout the entire elimination period[.]" *Id*.
at 85.  Clearly, Plaintiff was notified that she must demonstrate that she was disabled throughout the
elimination period and Plaintiff was given the opportunity to submit relevant medical
documentation.  Thus, the Court finds no merit to her argument.


Having addressed the issues raised with respect to Count 1, for the foregoing reasons,
the Court **DENIES** Prudential's Motion for Summary Judgment, **DENIES** Plaintiff's Motion for
Summary Judgment, but **GRANTS** Plaintiff's alternative request to remand the issue of benefits.

---

[6]Plaintiff further points out that Prudential actually issued its first denial letter two weeks
before the elimination period expired.

-26-

**II.**
**Failure to Provide**
**Requested Documents**

Under ERISA, a plan administrator must "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description . . . contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4), in part.  Failure to comply with such a request within 30 days may, in the court's discretion, be punished by sanctions of up to $110 per day of delay. 29 U.S.C. § 1132(c)(1).[7]  "The purpose of § 502(c)(1) is not to compensate participants for injuries, but to punish noncompliance

---

[7]Section 502(c)(1)(B) provides:

>©) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form

>(1) Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph . . . (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1)(B).  The civil penalty was adjusted from $100 per day to $110 per day for violations occurring after July 29, 1997. 29 C.F.R. § 2575.502c-1.

-27-

with ERISA." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996) (citation omitted). Therefore, it is not necessary for the requesting party to demonstrate prejudice as "a prerequisite to the imposition of penalties." *Id*. (citation omitted).  However, "prejudice is a factor that a district court may consider in deciding whether to impose a penalty.  The district court may also consider whether the administrator acted in bad faith." *Id*. (citation omitted).

In this case, Plaintiff's asserts that on August 28, 2007, her present counsel sent separate letters to Defendants requesting a copy of the Plan and the complete Administrative Record. *Complaint*, at ¶ 31.  In relevant part, the letter to the "Plan Administrator" for "Columbia Gas Transmission Corporation" requested "a copy of the Long-Term Disability Plan description and policy (including attachments and amendments)." *Plaintiff's Motion for Summary Judgment*, Exhibit E.  Similarly, the letter sent to Prudential sought "[c]omplete copies of the Plan, Summary Plan Description, Policy and any and all attachments and amendments[.]" *Admin. R.* at 381.  The request to Prudential also contained a signed release from Plaintiff for a release of her records.  On September 11, 2007, Nancy Pichette, a Senior Appeals Analyst for Prudential, responded to counsel's letter by stating, in part, a copy of her file was sent to Plaintiff's previous counsel on May 2, 2007, and current counsel should request a copy from previous counsel. *Id*. at 49.  Prudential's phone log also shows that Bonnie Lucas of NiSource contacted Prudential and was advised on September 12, 2007, of Prudential's response. *Id.* at 46.[8]  Other than this phone call, NiSource does

---

[8]The Call Log from Prudential on September 12, 2007 provides, in part:

> adv er info rec'd frm attny ofc 9/9
> adv pru responded 9/11

(continued...)

not claim that it took any other action regarding the request until September 25, 2008, when counsel

for NiSource sent Plaintiff's counsel a copy of the Plan via e-mail because it was unclear to her

whether Plaintiff's counsel ever received a copy. *See Memorandum of Defendants NiSource, Inc.,*

*d/b/a Columbia Gas Transmission Company, and NiSource Long-Term Disability Plan in*

*Opposition to Plaintiff's Motion for Summary Judgment, Affidavit of Adele E. O'Conner,* at ¶¶ 2-3,

Exhibit A.

 

        Both Prudential and NiSource argue they are entitled to summary judgment on this

claim.  The statutory language makes it clear that this cause of action may be brought only against

the Plan Administrator, in this case NiSource.[9]  Prudential asserts that, as it is neither the Plan

Sponsor nor the Plan Administrator, it had no obligation to provide the Plan documents to Plaintiff.

---

[8](...continued)
> er q'd if what was sent to attny frm pru can be fwded to er as  well
> adv er
> no bec no auth in file to release info to er
> er adv would keep in-house counsil [sic] updated
> er term'd p/c

*Id*. at 46.

    [9]ERISA defines "administrator" as:

> (I) the person specifically so designated by the terms
> of the instrument under which the plan is operated;
> (ii) if an administrator is not so designated, the plan
> sponsor; or
> (iii) in the case of a plan for which an administrator is
> not designated and a plan sponsor cannot be
> identified, such other person as the Secretary may by
> regulation prescribe.

29 U.S.C. § 1002(16)(A).

Plaintiff appears to recognize this fact in her Motion for Summary Judgment as she discusses this claim as being against NiSource.  Therefore, the Court **GRANTS** Prudential's Motion for Summary Judgment as to Count 2.

NiSource also asserts that it is entitled to summary judgment for a number of reasons. First, NiSource argues that Plaintiff does not have standing to bring a claim because she has not worked for NiSource since January 6, 2005, and she has no reasonable expectation of returning to covered employment under the Plan.[10]  The Court finds no merit to NiSource's contention.

Pursuant to 29 U.S.C. § 1132(a)(1), "[a] civil action may be brought . . . by a participant or beneficiary[.]" 29 U.S.C. § 1132(a)(1).  A "participant" is defined as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer[.]" 29 U.S.C.§ 1002(7).  Here, it is undisputed that Plaintiff was an employee of Columbia Gas Transmission Company on January 6, 2005, when she sustained an on-the-job injury.  Plaintiff applied for and received short-term disability benefits from January 7, 2005, through July 15, 2005. Before her short term disability benefits expired, she applied for long-term disability benefits.  This claim was denied and, ultimately, spurred this litigation.

---

[10]Actually, Plaintiff returned to work on May 17, 2005, but fell the next day when getting out of a company vehicle. *Id*. at 312.

In order to receive long-term disability benefits under the Plan, Plaintiff must show, inter alia, that she is "unable to perform the duties of any *gainful occupation* for which . . . [she is] reasonably fitted by education, training or experience." *NiSource Inc., Class 1, Long Term Disability Coverage*, at 11 (italics and bold original).  If the Court were to follow NiSource's logic, an employee who stops working because of a disability, who then seeks long-term disability benefits because of an alleged inability "to perform the duties of any gainful occupation," would be ineligible for such benefits because he or she had ceased their employment and had no intent to return.  To say Plaintiff cannot be considered a "participant" under these circumstances is directly contrary to the definition of "participant" which includes a "former employee" under § 1002(7), and it makes long-term disability insurance a complete legal fiction.[11]  It would be entirely nonsensical for this Court to find Plaintiff lost standing to bring a claim because she claims she is no longer able to work.  Therefore, the Court **DENIES** NiSource's motion on this ground.

NiSource also asserts that Plaintiff has no colorable claim to vested benefits because the request for documents was made nine months after the November 20, 2006, final decision denying her claim for benefits.  Again, the Court finds this argument completely without merit.  NiSource makes no argument that she filed this action outside the statute of limitations, and there is nothing inherent about requesting the documents nine months after the decision that makes her

---

[11]In support of its argument, NiSource cites *Clark v. E.I. DuPont de Nemours & Co.*, 105 F.3d 646 (4th Cir. 1997) (per curiam).  The Court finds this case entirely distinguishable.  In *Clark*, the plaintiff had not worked as an employee of DuPont for approximately 23 years. 105 F.3d at *1. During that time, the plaintiff worked for other companies who did contract work and employee leasing with DuPont.  However, the plaintiff was not on DuPont's payroll. *Id.*  Under those circumstances, the Fourth Circuit found that the Plan Administrator did not abuse its discretion in denying the plaintiff benefits. *Id.* at *3.

-31-

claim for benefits invalid.  Moreover, NiSource was aware that Plaintiff disputed the decision months earlier by the fact that she retained counsel and that counsel sent a letter to Prudential on April 18, 2007, requesting a copy of the claim file.[12]  The fact that Plaintiff's present counsel sent his letter in August is inconsequential to the validity of her claim.

Next, NiSource argues Plaintiff's counsel only requested a copy of the "Plan description and policy" in the letter addressed to the Plan Administrator.  Although counsel requested copies of the actual Plan and administrative Record from Prudential, NiSource asserts those requests were not made in the letter it received.  In addition, NiSource claims that it is not required under § 104(b)(4) of ERISA to provide a copy of the administrative record.  Without even reaching the issue of the administrative record, it is clear that counsel requested information from NiSource that is required to be furnished under § 104(b)(4), which includes, "the latest updated summary, plan description, plan description . . . contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).  In his letter, counsel specifically asked for "a copy of the Long-Term Disability Plan description and policy (including attachments and amendments)." *Letter from Mark F. Underwood to Plan Administrator*, Aug. 28, 2007.  In addition, counsel specifically referenced the penalty section under § 502(c) of ERISA, and stated: "a Plan Administrator who fails or refuses to comply with a request for any information within 30 days after such request, may in the court's discretion be personally liable to such participant in the amount of up to $110 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c)(1).

_____

[12]NiSource clearly knew of Plaintiff retained counsel because Prudential's phone log shows that Brenda Lucas called Prudential on April 25, 2007, and advised Prudential that NiSource had received a letter from Plaintiff's counsel. Admin. R. at 46.

Even though NiSource states that Plaintiff never specifically asked for a copy of the "Plan" in the letter, the Court does not read the letter so narrowly. First, Plaintiff specifically requested any "instruments under which the plan is established or operated," which necessarily would include a copy of the Plan itself. Thus, the Court rejects NiSource's argument that Plaintiff did not request a copy of the Plan. Second, Plaintiff's allegations in Count 2 of the Complaint are much broader than a simple failure to provide a copy of the Plan. Plaintiff asserts:

> 32. On or about September 11, 2007, Defendant, The Prudential Insurance Company of America responded to the letter request. However, it refused to produce the requested information, including, *but not limited to* the Administrative Record and Plan, as required by the statute and the Department of Labor Regulations. Defendant NiSource, Inc. d/b/a Columbia Gas Transmission Company also refused to produce the requested documents.

> 33. The Defendants, on[e] or both, are plan administrators, and have failed or refused to comply with numerous requests for information, e.g. *the Plan and Administrative Record*.

*Complaint*, at ¶¶ 32-33 (first italics added). Clearly, Plaintiff did not limit her action under § 104(b)(4) to a mere failure to provide a copy of the Plan and Administrative Record. The letter sent by Plaintiff's counsel to NiSource requested other documents covered by § 104(b)(4) as well. As those documents also were not provided by NiSource, the Court finds it is not entitled to summary judgment on Count 2.

Next, the Court rejects NiSource's argument it was not required to send the requested documents to counsel because the letter he sent to NiSource did not contain a release. There is no indication in the Administrative Record that NiSource denied counsel's request for information because counsel sent the release to Prudential rather than NiSource. Instead, it is clear that the

reason why NiSource did not respond to the letter for over a year is because it imprudently relied

upon Prudential's representation that it responded to the correspondence it received. *See Admin. R.*,

at 47 (phone log between Ms. Valencia of Prudential and Ms. Lucas of NiSource).  Moreover, there

is no evidence or argument that NiSource ever insisted upon a copy of the release being sent directly

to it.  Nevertheless, counsel for NiSource ultimately e-mailed a copy of the Plan to counsel, albeit

over a year after the request was made and after this lawsuit was filed alleging that a copy of the

Plan was never provided.  The e-mail from counsel specifically stated: "Dear Mr. Underwood, it is

not clear to me whether your client, her [prior] attorney . . . or you have received the NiSource Long

Term Disability Plan.  If you have not received it, it is attached to this email.  Thanks for your

attention to this matter. Adele O'Conner" *E-mail Correspondence between Ms. O'Conner and Mr.*

*Underwood* (dated Sept. 25, 2008). *Memorandum of Defendants NiSource, Inc., d/b/a Columbia Gas*

*Transmission Company, and NiSource Long-Term Disability Plan in Opposition to Plaintiff's*

*Motion for Summary Judgment,* Exhibit 1.  Under these circumstances, the Court will not permit

NiSource to bootstrap its failure to provide the requested documents upon its post-hoc

rationalization that it did not receive a copy of the release.


NiSource further argues the "Claim File" was sent to Plaintiff's previous counsel and

her new counsel was told that he could get the claim file from him.  However, as evidenced by Ms.

O'Conner's e-mail, it was even unclear to her whether the file sent to prior counsel included a copy

of the Plan.  Therefore, even if the Court were to assume for the sake of argument that NiSource

could rely upon Prudential's representation that prior counsel previously received a copy of the

"Claim File," NiSource obviously cannot demonstrate that he ever received a copy of the Plan. Thus, the Court again rejects NiSource's argument.

Finally, NiSource argues that it is not liable because the letter from Plaintiff's current counsel requesting the documents was not properly addressed. The letter was sent by certified mail to:

> Plan Administrator
> Columbia Gas Transmission Corporation
> 801 E. 86th Avenue
> Merrillville, IN 46410

*Plaintiff's Motion for Summary Judgment, Exhibit E.* NiSource assets that because the letter was addressed to Plaintiff's employer Columbia Gas Transmission Corporation, rather than NiSource, Plaintiff's counsel never actually requested the documents from NiSource. However, the Court notes that the letter is addressed to the "Plan Administrator" and the physical address on the letter is for NiSource's corporate headquarters, not Columbia Gas Transmission Corporation's headquarters.[13] In addition, someone obviously accepted the certified letter at that address as there is no suggestion that it was returned to Plaintiff's counsel as being undelivered. Moreover, it appears obvious that NiSource actually received the letter as Ms. Lucas of NiSource contacted Prudential a few days later and was informed that Prudential responded to Plaintiff's counsel's requests. Therefore, the Court finds no merit to NiSource's argument that it cannot be held liable under § 104(b)(4) because Plaintiff's counsel made an inadvertent technical error in the address that did not change the fact the letter was received by the intended party.

---

[13]Columbia Gas Transmission Corporation's principal place of business is Fairfax, Virginia. *See Memorandum Opinion and Order*, at 1-2 (entered on Nov. 3, 2008).

Having considered and denied the arguments by NiSource, the Court finds that summary judgment on Count 2 is appropriate in favor of Plaintiff.  The evidence submitted shows that counsel clearly requested information governed by § 104(b)(4) which was not provided by NiSource for over a year.  Thus, the Court finds NiSource violated the statute.  Under § 502(c)(1) of ERISA, a court, in its discretion, may award up to $110 per day of delay against a plan administrator who fails to provide requested documents under § 104(b)(4). 29 U.S.C. § 1132(c)(1). The Fourth Circuit stated in *Davis v. Featherstone*, 97 F.3d 734 (4th Cir. 1996), that the aim of the statute "is to provide plan administrators with an incentive to meet requests for information in a timely fashion." *Id.* at 738.  In *Faircloth*, the Fourth Circuit further explained that "[t]he purpose of § 502(c)(1) is not to compensate participants for injuries, but to punish noncompliance with ERISA. Accordingly, prejudice to the party requesting the documents is not a prerequisite to the imposition of penalties." 91 F.3d at 659 (citations omitted).  However, the Fourth Circuit stated that both prejudice and bad faith on the part of the administrator are factors a court can consider in deciding whether a penalty should be imposed. *Id.* (citations omitted).  In addition, a court may consider "frustration, trouble, and expense . . . in deciding whether to impose a penalty." *Davis*, 97 F.3d at 738.

In this case, the Court has little difficulty finding a penalty is warranted.  Counsel made a written request for documents on August 28, 2007.  It was not until September 25, 2008, that counsel for NiSource e-mailed a copy of the Plan and its amendments to Plaintiff's counsel. Excluding the thirty day period NiSource had to respond, the Court finds NiSource delayed providing the information by approximately 362 days.  If the Court were to award the entire amount

of \$110 per day, it would result in a total penalty of \$39,820.  However, the Court does not believe that a penalty in that amount is warranted under the circumstances of this case.

Although the Court has no doubt that Plaintiff was frustrated by NiSource's lack of diligence and she had to bring a claim in this lawsuit to get NiSource to send her a copy of the Plan and the amendments, it does not appear that NiSource was acting out of a malicious disregard to Plaintiff's request.  Instead, NiSource imprudently relied upon Prudential's oral representation that it responded to the request.  It appears from Prudential's phone log that Ms. Lucas requested a copy of whatever was sent to Plaintiff's counsel, but Prudential denied the request because there was no authority in the file to release the information to the employer.  To make sure its bases were covered, NiSource could have easily avoided the penalty it now faces by sending the information requested to Plaintiff's counsel but, instead, NiSource decided to sit idly by and rest its laurels on the unseen information Prudential said it sent.  Given this posture and considering the factors set forth by the Fourth Circuit, the Court finds that a penalty in the amount of \$50 per day, for a total of \$18,100 is warranted.  The Court finds that this amount adequately punishes NiSource for its violation of the statute and takes into account the frustration and trouble Plaintiff experienced.  Therefore, the Court **GRANTS** summary judgment in favor of Plaintiff on Count 2 and **AWARDS** her the sum of **\$18,100**.

### III.
### CONCLUSION

Accordingly, as to Count 1, the Court **DENIES** Prudential's Motion for Summary Judgment [Doc. No. 40], **GRANTS** NiSource's Motion for Summary Judgment [Doc. No. 42], and **DENIES** Plaintiff's Motion for Summary Judgment, but **GRANTS** Plaintiff's alternative request

that the benefit issue be remanded to Prudential for further consideration [Doc. No. 45]. With respect to Count 2, the Court **GRANTS** Prudential's Motion for Summary Judgment [Doc. No. 40], **DENIES** NiSource's Motion for Summary Judgment [Doc. No. 42], **DENIES** Plaintiff's Motion for Summary Judgment against Prudential, but **GRANTS** her Motion for Summary Judgment against NiSource and **AWARDS** Plaintiff the amount of $18,100 [Doc. No. 45]. The Court **REMANDS** the issue of benefits to Prudential for further consideration.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        March 23, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE